J-S29016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: L.I.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.J. AND S.B.J., PARENTS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 658 WDA 2025 |

Appeal from the Order Entered April 7, 2025
In the Court of Common Pleas of Clearfield County Orphans' Court at
No(s): OC-3752-2024

BEFORE: NICHOLS, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY SULLIVAN, J.:           **FILED: October 7, 2025**

T.J. ("Father") and S.B.J. ("Mother") (collectively, "Parents") jointly appeal from the order involuntarily terminating their parental rights to their biological daughter, L.I.J. ("Child"), born in July 2021. Parents' court-appointed counsel, David Patrick King, Esquire ("Counsel"), has filed a petition to withdraw and an accompanying brief, pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009). After review, we grant Counsel's application to withdraw and affirm the termination order.

The Orphans' Court summarized the initial factual and procedural history of this case, as follows:

> [Clearfield County Children, Youth, and Family Services ("CYF" or "the Agency")] became involved with the family upon the birth of [Child] [in July 2021]. Based upon concerns identified in reports regarding Parents' lack of ability to care for [Child], as well as poor home conditions, the Agency filed an application for emergency

protective custody on July 30, 2021. [Child] was placed in foster care directly from the hospital on July 30, 2021, and remains with her current foster parents, [J.M. and J.M.]. On August 2, 2021, a shelter care hearing was held, at which time . . . both legal and physical custody of Child w[ere] placed with the Agency. On August 4, 2021, the Agency filed a petition for dependency [and] . . . a hearing on the petition was held on August 10, 2021.

Orphans' Court Opinion and Order, 4/7/25, at 1.

The court adjudicated Child dependent in August 2021, and established reunification as Child's permanency goal. In furtherance of that goal, the court ordered Parents to, *inter alia*: (1) participate in parenting capacity evaluations; (2) complete parenting classes; (3) complete anger management classes; (4) participate in bonding assessments, and (5) attend supervised visitation with Child.

Parents completed parenting and anger management classes. However, multiple service providers, including Madison Barnett ("Ms. Barnett"), the case manager from Parents' anger management program at Community County Services, and Kara McGarry ("Ms. McGarry"), Parents' family support manager from Children's Aid Society, determined Parents did not retain the information from the classes and failed to implement the skills taught during supervised visitation. Ms. Barnett noted Parents required a second course only a few months after completing their initial one. **See** N.T., 8/28/24, at 11-15; N.T., 11/4/24, at 108-09, 141-43, 162-64.

Ms. McGarry found in the year that she supervised visits for Parents, they made no progress with handling Child's basic care. **See** N.T., 8/28/24,

at 11-12. She wrote a report summarizing her experiences with Parents stating that from August 2021 until May 2022, Parents repeatedly left Child inappropriately unattended, struggled to strap her into infant chairs, left her alone to perform menial tasks like going to a store, and spent time on their cell phones during supervised visits.[1] *See* N.T., 8/28/24, at 7-8; CYF Exhibit 1 at 1-3 (unpaginated). Ms. McGarry's report showed that during a visit in May of 2022, when Child was nearly one year old, Mother asked for instructions on how to make a bottle for Child. *See* CYF Exhibit 1 at 3 (unpaginated).

Tina Siegel ("Ms. Siegal"), the instructor from Parents' parenting program at the Guidance Center, and Heather Gould ("Ms. Gould"), Parents' family preservation coordinator at Community County Services ("CCS"), had similar experiences with visits they supervised with Parents and Child from June 2022, through June 2024. *See* N.T., 11/4/24, at 141-43, 162-64. Ms. Gould "estimate[d] 95 percent of the time [Parents] would need instruction from me." *Id*. at 165. Ms. Gould wrote a report stating that multiple safety concerns needed to be pointed out to Parents, such as the danger to Child putting plastic bags on her head and choking hazards in her mouth, as well as

---

[1] Children's Aid Society, Ms. McGarry's employer, ceased supervising visits for the family in May 2022, after Parents made repeated and continued threats to the staff. *See* CYF Exhibit 1 at 1-3. CYF supervised visits from June 2022, until January 2023. *See* CYF Exhibit 12. Thereafter, Community County Services supervised visits until the court stopped them in June 2024. *See id*.

climbing on furniture. *See* N.T., 11/4/24, at 170-78; CYF Exhibit 9 at 6-7, 16. One example stated:

> On 4/18/23, [Child] was putting a large Ziploc storage bag on her head. [Father] didn't stop her and [Mother] was playing with flash cards on her own. Worker had to intervene and tell Parents it was a suffocation hazard.

CYF Exhibit 9 at 16. Ms. Gould also reported that Parents repeatedly left Child unsupervised during the visitation. *See id*. at 6-7, 10, 16. For instance, Parents would "often" leave Child alone with the visit supervisor and exit the room to do household chores or use their cell phones. *Id*. at 7, 10. Further, Parents would regularly have to be reminded to focus on Child during the visits instead of speaking with the caseworkers. *See id*. at 9.

Ms. Gould's report further detailed how Parents struggled to care appropriately for Child during the supervised visits, such as Father suggesting two-year-old Child be "grounded" for being "fussy." *Id*. at 7. CCS staff continually reported that Parents often ignored direction from supervision staff and did not see the issues with the staff's concerns. *See id*. at 7, 16 (Mother stated that "she did not like [staff] telling her what to do" and would ignore workers when discussing concerns about her parenting; "On 5/7/24, [Father] commented that he likes not having to watch [Child] because he knows she cannot get hurt. He says he just has to check on her."). CYF's caseworker, Jennnifer Grenus ("Ms. Grenus"), stated that "none of the service providers felt that [Parents] could be left alone with [Child] or parent [Child] on their own." N.T., 12/9/24, at 17-18.

At some point in 2022, Parents' supervised visitation was reduced from multiple visits to one or two times per week. *See* CYF Exhibit 1; CYF Exhibit 9; CYF Exhibit 12. Parents attended most of the visits. *See* CYF Exhibit 1; CYF Exhibit 9; CYF Exhibit 12. However, Parents never progressed beyond supervised visitation. *See* N.T., 12/9/24, at 21. Parents' aggression toward staff necessitated the involvement of a large number of different service providers to supervise visitation over the life of the case. *See* CYF Exhibit 1; N.T., 11/4/24, at 122-23.

Clinical psychologist Bradley Beckwith, Psy.D. ("Dr. Beckwith") conducted separate individual parenting capacity evaluations of Parents that included IQ testing. Dr. Beckwith determined both Parents evidenced a general "intellectual disability diagnosis," which reflected "global impairment in [their] overall intellectual functioning." N.T., 11/4/24, at 34; CYF Exhibit 2 at 7; CYF Exhibit 3 at 7. Dr. Beckwith concluded that Parents' "significant" cognitive impairments with comprehension, reasoning, problem solving, and memory impair their ability to understand and provide for Child's basic needs, and that because those conditions were unlikely to change, they would require constant CYF support and meaningful compliance with services to safely parent for as long as they parented. *See* N.T., 11/4/24, at 20-32; CYF Exhibit 2 at 7-9; CYF Exhibit 3 at 6-9. Dr. Beckwith recognized that "cognitive-limited people can be parents. They can be good parents." However, he concluded that such parents "must . . . have some awareness of what [their] limitations

are," and accept ongoing services and supports. **See** N.T., 11/4/24, at 30-31. In Dr. Beckwith's view, Parents' inability to understand their need for help was ultimately "the biggest obstacle for both of them because neither of them really thinks that they need it." **See id**.

Parents attended a bonding assessment with a psychologist, Allen Ryen, Ph.D. ("Dr. Ryen"), in January 2023. **See** N.T., 11/4/24, at 60-61. Dr. Ryen observed a range of Child's negative reactions to Parents during the evaluation: Child "rarely looked" at Parents; "avoided" and "evaded" Parents; "refused to be held [by Parents], unless forcibly;" "didn't initiate any interactions" with Parents; and "would scream and yell and cry and stiffen" or "shut down" Parents' attempts to interact with her. **Id**. at 65-67.

The Agency requested an updated bonding assessment in 2024. **See id.** at 60-61; CYF Exhibit 5. Parents refused to participate in the second evaluation. **See** N.T., 11/4/24, at 61. Consequently, Dr. Ryen's in-person observations for the second evaluation were only between Child and foster father. **See id**. at 61.[2] Following the May 2024 bonding assessment, Dr. Ryen determined continued visitation with Parents was not in Child's best interest due to persistent, unresolved concerns about Child's basic needs and safety while in Parents' care, even while supervised, and the lack of a bond between

---

[2] Dr. Ryen also reviewed CYF's documentation from supervised visitation from the year and a half between the first and second evaluations. **See** CYF Exhibit 5, at 5-7.

Child and Parents after three years of dependency. *See* N.T., 11/4/24, at 84; 12/9/24, at 17, 22; CYF Exhibit 5, at 5-7. Dr. Ryen specifically concluded Parents had made no progress with their parental capacity or their bond with Child. *See id*. at 5-7. CYF's visitation documentation showed that the Agency had persistent concerns about Parents' parenting capacity, which never resolved during Child's dependency. *See generally* CYF Exhibit 9.[3] Similarly, the same documentation evidenced that visitation supervisors continually reported concerns about Child's lack of a bond with Parents, even well into 2024. *See* N.T., 11/4/24, at 84; CYF Exhibit 9 at 9-11. Ultimately, Dr. Ryen opined that if Child presently had a bond with Parents, it was "very weak." *Id*. at 72. He concluded termination of Parents' parental rights would not have a negative impact on Child. *See id*. at 82.

_____

[3] Child has significant developmental delays in her speed and motor skills. *See* N.T., 11/4/24, at 64-65, 77, 166, 179; N.T., 12/9/24, at 18, 24. At almost three years old, Child was not potty-trained, walked on her tiptoes, had issues with balance, and only spoke a handful of one-syllable words. *See* CYF Exhibit 5 at 3; N.T., 12/9/24, at 25. Dr. Ryen opined Child may have an intellectual disability, a neurological condition, and/or potential autism. *See id*. Dr. Ryen reported Child "will continue to have significant special needs" because her "disabilities are clearly not environmentally induced." N.T., 11/4/24, at 84; CYF Exhibit 5, at 5. Dr. Ryen determined Child will require "extraordinary parenting" due to her significant special needs and opined Parents "are not up to the task of raising a special needs child." N.T., 11/4/24, at 78; CYF Exhibit 5 at 3-6.

On July 11, 2023, following a permanency review hearing, the court changed Child's permanency goal to adoption.[4] On April 5, 2024, CYF filed separate petitions to involuntarily terminate Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The Agency petitioned for special relief terminating visitation; the court granted the petition in June 2024. *See* N.T., 12/9/24, at 17, 22; CYF Exhibit 5.

The Orphans' Court held an evidentiary hearing on the Agency's petitions that began in August 2024, when Child was three years old, and continued on two additional dates over the next five months at which the court heard the evidence discussed above.[5] At the conclusion of the hearing in December 2024, the court ordered the parties to file briefs stating their positions. By order dated and entered on April 7, 2025, the Orphans' Court involuntarily terminated Parents' rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court filed an accompanying opinion, stating its reasons for granting the Agency's petitions.

Parents filed a timely notice of appeal and eventually filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

---

[4] Parents did not appeal the goal change order.

[5] Separate attorneys represented Child's best interests and legal interest in compliance with 23 Pa.C.S.A. § 2313(a).

1925(a)(2)(i) and (b).[6] The court filed a letter in lieu of a Rule 1925(a) opinion, explaining that it would not file an additional opinion. Counsel filed an **Anders** brief in this Court, along with a petition to withdraw as Parents' attorney.[7]

When counsel seeks to withdraw pursuant to **Anders** and its progeny, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. **See In re Adoption of M.C.F.**, 230 A.3d 1217, 1219 (Pa. Super. 2020). To satisfy the procedural requirements in requesting to withdraw from representation, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

---

[6] Parents failed to file their concise statement of errors complained of on appeal contemporaneously with their notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On April 30, 2025, the Orphans' Court ordered Parents to a file concise statement. **See** Order, 4/30/25. Parents timely complied. Because Parents complied with the Orphans' Court's order, and there is no assertion of any prejudice, we decline to find waiver. **See In re K.T.E.L.**, 983 A.2d 745, 747 n.1 (Pa. Super. 2009) (an appellant's failure to simultaneously file a Rule 1925(b) statement in a children's fast track case did not result in waiver of all issues for appeal where the appellant later filed the statement, and there was no allegation of prejudice from the late filing).

[7] The **Anders** procedure extends to appeals from orders involuntarily terminating parental rights. **See In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992).

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). Counsel must also attach to the petition to withdraw a copy of the letter sent to the clients advising them of their rights. *See Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Here, Counsel has submitted both a petition to withdraw and a brief certifying that, following a conscientious and thorough review of the record and relevant case law, Counsel believes Parents' appeal is frivolous. *See Anders* Brief at 6, 41; Petition to Withdraw as Counsel for Appellants, 6/26/25, at 3-4. Counsel also attached to the petition a letter advised Parents of their rights to retain new counsel or proceed *pro se*, and to raise additional points they deem worthy of this Court's attention, and served both documents on Parents. *See* Petition to Withdraw as Counsel for Appellants, 6/26/25, at Exhibit A.[8] Thus, we conclude Counsel satisfied the *Anders* requirements for withdrawal.

In addition to the procedural requirements discussed above, our Supreme Court has set forth the following requirements for *Anders* briefs:

> [C]ounsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

---

[8] Parents have not filed a response to the petition in this Court.

***Santiago***, 978 A.2d at 361.

Counsel's ***Anders*** provides a sufficient summary of the procedural and factual history of this matter, including citations to the certified record, and an adequate discussion of the controlling Pennsylvania law. ***See id***. at 7-22. Counsel's brief also sufficiently explores several potential arguments that could support Parents' challenges to the termination of their parental rights. ***See id***. at 22-40. Counsel provides a thorough explanation regarding the conclusion Parents' claims are frivolous. ***See id***. at 41-56. Accordingly, Counsel's brief complies with the ***Santiago*** requirements.

We accordingly review the record to determine if on its face, there are non-frivolous issues that counsel missed or misstated. ***See Commonwealth v. Yorgey***, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

- 11 -

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations, quotation marks, and brackets omitted).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*); *M.E.*, 283 A.3d at 830.

- 12 -

Our analysis focuses upon section 2511(a)(2) and (b), which provide,

as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy section 2511(a)(2), the petitioning party must establish: "(1)

repeated and continued incapacity, abuse, neglect or refusal; (2) that such

incapacity, abuse, neglect or refusal caused the child to be without essential

parental care, control or subsistence; and (3) that the causes of the

incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re***

***Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for

termination pursuant to section 2511(a)(2), are not limited to affirmative

misconduct, but include irremediable parental incapacity. ***See id***. Overall,

- 13 -

we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." **A.H.**, 247 A.3d at 443.

Further, it is well-settled that section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." **In re Adoption of J.J.**, 515 A.2d 883, 892-93 (Pa. 1986). Our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment or the fact the impairment may make the parent less desirable than another parent." **Id**. at 893. "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated . . .." **Id**.

If the Orphans' Court concludes adequate grounds for termination exist pursuant to section 2511(a), the court addresses section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); **see also T.S.M.**, 71 A.3d at 267. Our Supreme Court has outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> * * * * *
>
> [T]he determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a

case-by-case basis. . . . [T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

\* \* \* \* \*

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (internal citations, quotations, and footnotes omitted).

Not all bonds are beneficial and worth preserving. *See Interest of Z.N.B.*, 327 A.3d 241, 255 (Pa. Super. 2024); only a necessary and beneficial bond should be maintained. *See Interest of K.T.*, 296 A.3d at 1109. The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *T.S.M.*, 71 A.3d at 269 (also noting the failure of courts can result in catastrophically maladjusted children).

The Orphans' Court found Parents' cognitive impairments constituted a repeated and continued incapacity that caused Child to be without parental control, care, or subsistence necessary for her physical and mental well-being. *See* Orphans' Court Opinion, 4/7/25, at 22. The court found Parents cannot or will not remedy their "impaired parenting abilities" because they have failed to do so in three years, despite CYF's services and assistance. *Id*.

Counsel raises a potential issue that the Agency did not meet its evidentiary burden as to section 2511(a)(2). *See Anders* Brief at 25-30. Counsel states it could be argued the Orphans' Court should have discredited Dr. Beckwith's parenting capacity evaluation because Child was not part of the evaluations; Counsel also notes Parents' completion of anger management and parenting courses. *See id*.

The record supports the Orphans' Court's (and Counsel's) conclusion that Parents' claim is frivolous. The court had discretion to determine the credibility of Dr. Beckwith's expert testimony following his 2022 IQ assessments of Parents that revealed impairments with their comprehension, reasoning, problem solving, and memory, which indicated "intellectual disability diagnos[e]s" that were not likely to change. *See In re R.A.M.N.*, 230 A.3d 423, 427 (Pa. Super. 2020) (stating that an Orphans' Court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations[.]") (citation omitted). Parents displayed the inability to retain information and CYF had continuing concerns about their

anger management. Ms. McGarry's testimony showed Parents' lack of progress with Child's basic care, inability to retain information, potential for distraction and willingness to leave Child inappropriately unattended, which testimony Ms. Gould corroborated. Ms. Gould's testimony also established Parents' failure to attend to safety concerns. Additional evidence in the report established that Parents often ignored direction from supervision staff and did not understand the identified safety issues, causing the service providers to conclude Parents could be left alone with Child.

Because Parents failed to make any appreciable progress with respect to their parental incapacity despite the provided services in the approximately three years that Child has been out of their custody, the record undoubtedly demonstrates their incapacity cannot or will not be remedied. The Orphans' Court properly found that termination of Parents' parental rights was warranted pursuant to section 2511(a)(2). We agree with Counsel's assessment that Parents' appeal as to this subsection is frivolous.

Regarding section 2511(b), the Orphans' Court found that the bond between Child and Parents is not "a secure, primary bond." Orphans' Court Opinion, 4/7/25, at 28. The court determined Child has her primary parental bond with her foster parents, who provide her with the safety, security, and permanency that Parents cannot. *See id*. at 29-30. The court concluded that Child would not suffer any negative impact from termination. *See id*. at 29.

Counsel offers a potential argument that the Agency did not meet its evidentiary burden as to this subsection. *See Anders* Brief at 34-40. Counsel suggests the argument Dr. Ryen's bonding assessment derived from "flawed" and "unreliable" testing methods upon which the court should have not relied. *Id.* at 35-37. Counsel also cites the testimony of Parents' visitation supervisors of affection between Child and Parents. *See id.* at 37-40 (citing N.T., 11/4/24, at 118-19, 122, 126-27, 131-32, 154, 182-84) (testimony from Ms. Gould and an Early Head Start home visitor that during visitations, Child appeared excited to see Parents; Child would seek out Parents to play; Father would actively play with Child; Father would hug and kiss Child, which she accepted; Child would occasionally accept physical affection from Mother).

The Orphans' Court's findings have ample record support, demonstrating Counsel's proposed argument is frivolous. Dr. Ryen's testimony established that in the January 2023 bonding assessment, Child rarely looked at Parents, evaded them, refused to be held by them, and became upset and reacted physically when they attempted to interact with her. Conversely, Dr. Ryen noted Child's "positive, loving, primary secure bond" with foster parents. N.T. 1/4/24, at 82. Although Parents refused to participate in the May 2024, updated bonding assessment, Dr. Ryen's evaluation of Child's interactions with her foster parents and review of CYF's documentation for the previous one-and-one-half years led to the conclusion Parents had made no progress with their bond with Child, a conclusion

supported by observations of visitation supervisors. That evidence showed any bond between Child and Parents was very weak, and termination would not have a negative impact on Child, even without regard to Parents' inability to raise a special needs child.

The foregoing evidence amply supports the Orphans' Court's conclusion termination of Parents' parental rights was in Child's best interests. Therefore, we discern no abuse of discretion in the Orphans' Court's conclusion that CYF met its evidentiary burden pursuant to section 2511(b). Accordingly, we agree with Counsel's assessment that Parents' appeal as to this subsection is frivolous.

Based on our independent review, the certified record reveals no preserved non-frivolous issues that would arguably support this appeal and agree with Counsel's assessment that this appeal is wholly frivolous. Thus, we grant Counsel's application to withdraw from his representation of Parents and affirm the order involuntarily terminating Parents' parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Application to withdraw granted. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/7/2025